IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KINDER MORGAN BULK | : | CIVIL ACTION |
| TERMINALS, INC. | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STEEL, PAPER AND | : | |
| FORESTRY, RUBBER | : | |
| MANUFACTURING, ENERGY, ALLIED | : | |
| INDUSTRIAL AND SERVICE | : | |
| WORKERS INTERNATIONAL UNION, | : | |
| AND ITS LOCAL 15253 | : | NO. 13-4386 |

<u>MEMORANDUM</u>

Dalzell, J.                                                                                                  April 4, 2014

        Kinder Morgan Bulk Terminals, Inc. ("Kinder Morgan" or "the Company")

brings this action against United Steel, Paper and Forestry, Rubber Manufacturing, Energy

Allied Industrial and Service Workers of America and its Local 15253 ("the Union" or "United

Steel"), seeking to vacate an arbitration award issued in favor of United Steel.  The arbitration

concerned the termination of a Kinder Morgan employee, Michael Hires, and the arbitrator found

that Kinder Morgan lacked just cause to fire Hires and concluded that Hires should be reinstated

with full back pay and benefits.  In response to Kinder Morgan's suit, United Steel

counterclaimed, seeking an order that Kinder Morgan reinstate Hires with unimpaired seniority

and pay him back pay, benefits, and prejudgment interest.  Before us are the parties' cross-

motions for summary judgment.

        We exercise jurisdiction pursuant to 29 U.S.C. § 185[1] and 28 U.S.C. § 1331.

_____

[1] 29 U.S.C. § 185, section 301(a) of the Labor Management Relations Act ("LMRA"), provides
that

I.      Facts

      A.      Background

      Kinder Morgan operates a marine terminal in Fairless Hills, Pennsylvania, where employees load and unload cargo and transfer cargo for storage or ground transport by road and rail.  Stip. of Facts at ¶ 1.  United Steel is a labor organization that represents Kinder Morgan's bargaining unit employees at the Fairless Hills terminal. Id. at ¶ 3.  Hires is a longshoreman who worked for Kinder Morgan at the Fairless Hills terminal and was a member of the bargaining unit there.  Id. at ¶ 6.

      Kinder Morgan and United Steel signed a collective bargaining agreement ("CBA"), effective from April 14, 2008 through April 1, 2013, pursuant to which the parties resolved disputes through a three-step grievance procedure.  Id. at ¶ 4; CBA Art. 10, Stip. of Facts Ex. J1.  If they could not resolve their disputes through the internal grievance system, the Union was entitled to appeal the grievance to arbitration.  CBA § 10.2.4.  The arbitration provision of the CBA provided that the arbitrator will "have jurisdiction only over the interpretation or application of specifically identified provisions of the Agreement," and that his

---

      Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

An "industry affecting commerce" is "any industry . . . in which a labor dispute would burden or obstruct commerce or tend to burden or obstruct commerce or the free flow of commerce."  29 U.S.C. § 142.  The parties agree that Kinder Morgan is "an employer in an industry affecting commerce within the meaning of the LMRA", see Stip. of Facts at ¶ 2, and the description of its operations during the arbitration proceeding confirms this.  See Tr. of Arb., Stip. of Facts Ex. A, at 18 ("we load and unload ships [containing fertilizer and coal]; we warehouse what goes onto or comes off of the ships . . . some of it is loaded into railcars for shipment elsewhere.").

decisions will be "final and binding."  Id. § 10.3.B.  The CBA also provided that "[s]eniority and employment shall be lost" by "a lapse of (12) consecutive calendar months during which the employee performs no work for the Company", id. at § 25.5.

On September 9, 2010, Hires injured his neck and aggravated an earlier injury to his right arm while he was driving a water truck at the Fairless Hills terminal.  Stip. of Facts at ¶ 13.  Hires remained out of work and received longshoreman benefits under the Longshore and Harbor Workers' Compensation Act (LHMCA), 33 U.S.C. § 901, et seq. until September 8, 2011.  Id. at ¶¶ 17, 25.

While Hires was away from work he received medical opinions from three doctors, Dr. Plastaras, a physiatrist, and Drs. Mahaltru and Cohen, both neurosurgeons[2].  It appears that Dr. Plastaras performed an MRI on Hires that revealed that Hires had Arnold Chiari Malformation ("ACM"), a congenital condition, and a C herniated disc.  Id. at ¶¶ 19-21.  Dr. Plastaras referred Hires to Dr. Mahaltru, and Dr. Mahaltru "discussed surgery with Hires."  Id. at ¶ 21.  Dr. Cohen examined Hires as part of the LHMCA claim, id. at ¶ 22, and on July 28, 2011, Dr. Cohen wrote:

> This man cannot return to work (RTW) at this time -- but the reason for this has nothing whatever to do with his Arnold Chiari Malformation (ACM), his congenital condition.  Rather, he cannot return to work because his cervical spinal cord is being compressed significantly in his neck.  Because of that, I would not allow him to RTW until his C cord is decompressed.  To allow work in this circumstance would endanger his ability to move - and that would endanger both the patient and his employer.

July 28, 2011 Letter from Dr. Robert M. Cohen, Ex. C4 to Stip. of Facts.

---

[2] The parties do not address what happens if two neurosurgeons and a physiatrist walk into a bar. Judging from the divergent recommendations the doctors gave Hires, it appears to depend upon whom you ask.

3

On September 8, 2011 Hires returned to work with a note from Dr. Plastaras, whom he had seen on September 7, 2011, which read, "I had the pleasure of seeing Michael T. Hires.  He is not taking any medications.  He may return to work full duty."  Stip. of Facts ¶ 25.

During the hearing before the arbitrator, David Price, a human resources manager at Kinder Morgan, testified that Hires had returned to work on September 8, 2011, but that Bruce Kelly, a superintendent at the terminal, told Hires to leave and not return until he had spoken to Price.  Tr. at 95:2-7.

Kinder Morgan then asked the United States Department of Labor's Office of Workers' Compensation Programs ("DOL") to appoint a doctor to conduct an independent medical examination ("IME") on Hires.  Id. at ¶ 26.  The DOL selected Dr. Bong Lee, a neurosurgeon.  Id.  Dr. Lee examined Hires on February 16, 2012, and issued a report in which he made the following recommendation:

> As far as the injury to the right ulnar nerve associated with the incident of September 14, 2009, is concerned, Mr. Hires has had a complete recovery with no disability or any permanent impairment of function, and he would therefore be able to return to work as a longshoreman based on this injury.  However, he has a very serious cervical spondylosis with a disc herniation and Chiari malformation which is not a direct result of the incident of September 9, 2010, but rather, is a preexisting condition and one which could represent a great risk factor for more serious physical damage if he is involved in any future accidents, even in the case of a mild accident.  Therefore, it is not advisable for him to return to the nature of a job such as a longshoreman due to the risk factors regarding his cervical spine problems.

Feb. 16, 2012 Dr. Bong Lee Report, Stip. of Facts Ex. C3 at 5.

On March 16, 2012 Price had a conference call with Hires and Joe Padavan, a union representative, to discuss Hires's return to work in light of Dr. Lee's report.  Stip. of Facts at ¶ 29; Tr. 97:17-25.  Price told Hires and Padavan that Kinder Morgan did not have any light

duty work to offer Hires, and Hires and Padavan responded that Hires did not require an accommodation.  Stip. of Facts at ¶¶ 30-31.

On March 27, 2012 Kinder Morgan told Hires that based on the opinions of Dr. Cohen and Dr. Lee, the company would not allow Hires to return to work.  Id. at ¶ 32.  At the arbitration hearing, John Dalton, Vice President for Kinder Morgan East, testified that the decision not to allow Hires to return to work was based on the fear that "because of his spinal cervical condition" Hires could be seriously injured if he returned.  Id.  Kinder Morgan fired Hires under Section 25.5 of the CBA, based on the finding that he had been out of work for more than twelve months.  His firing was thus made retroactive to September 9, 2011.  Id. at ¶ 33.

On April 10, 2012 the Union filed a grievance pursuant to the CBA, and on May 7, 2012 the grievance was denied and referred to arbitration pursuant to Article 10 of the CBA. Id. at ¶ 34.  Arbitrator Jared N. Kasher held an arbitration hearing in Philadelphia, Pennsylvania, on March 21, 2013, and on June 29, 2013 he issued a decision in which he sustained the grievance and found that Kinder Morgan did not have just cause for firing Hires.  Arbitrator Kasher thus ordered Kinder Morgan to reinstate Hires with unimpaired seniority and with full back pay and benefits as of March 27, 2012.  Id. at ¶¶ 35-38.

B.     The Arbitrator's Findings

Arbitrator Kasher considered the CBA, the testimony of Dalton, Price, Padavan, and Hires, as well as medical reports from Dr. Robert Cohen (specifically, his reports of May 16, June 17, and July 28, 2011), and Dr. Bong Lee's February 16, 2012 report.  See Decision, Stip. of Facts Ex. B.  The arbitrator acknowledged that Kinder Morgan was bound by Article 13 of the CBA which prohibits discrimination on the basis of disability and provides that "the Company

and the Union shall provide reasonable accommodation to qualified individuals with a disability", and "shall determine the need for and extent of such accommodation in accordance with the requirements and interpretations of the Americans With Disabilities Act . . . .", CBA Art. 13.  Arbitrator Kasher found that after discussing with Hires the accommodations he might require, "[t]he Company concluded that there was no reasonable accommodation available and that it was unsafe to return the Grievant to work."  Decision at 20.

Arbitrator Kasher noted that under the Americans with Disabilities Act ("ADA"), an employer may assert the affirmative defense that "qualification standards . . . that screen out . . . or otherwise deny a job or benefit to an individual with a disability" are "job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation", id. (quoting 42 U.S.C. § 12113).  He then quoted the implementing regulations for the ADA which provide a "direct threat defense" that an employer may invoke in response to a charge of discrimination.  The regulations provide that

> Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:
> (1) The duration of the risk;
> (2) The nature and severity of the potential harm;
> (3) The likelihood that the potential harm will occur; and
> (4) The imminence of the potential harm.

Id. at 21 (quoting 29 C.F.R. § 1630.2(r)).

Arbitrator Kasher could not conclude that Hires "poses a significant risk of substantial harm" because of any physical limitations.  Id.  He compared the language of Dr. Cohen's report -- which said that allowing Hires to work would "endanger his ability to move" -- with the language of Dr. Lee's -- which said that Hires's preexisting condition "could represent a great risk factor for more serious physical damage" -- and he found that "[n]either physician quantifies the risk and/or harm that the Grievant could potentially incur."  Id.  Moreover, Arbitrator Kasher observed that "there is nothing in the record indicating that these doctors knew what specifically the Grievant was required to do at the Fairless Hills Terminal."  Id. at 22.

He ultimately found that "[s]imply stating that the Grievant could suffer a greater injury, or that a future injury could endanger his ability to move, is an opinion without foundation and one based on speculation and unqualified possibilities", id. at 21-22 (emphasis in original), and so "[t]hese reports do not provide this Arbitrator with guidance as to the Grievant's present ability to safely perform the essential functions of his job, nor do these reports provide any indication as to what work the Grievant could perform."  Id. at 22 (emphasis in original).

Arbitrator Kasher thus concluded that "[r]elying on only the reports of these independent medical examiners is insufficient for this Arbitrator to conclude that there is a significant risk of substantial harm to the Grievant and/or his coworkers if he were to work at the Fairless Hills Terminal."  Id.  Thus, "the decision to discharge the Grievant was not based on sufficient medical evidence and therefore there was not just cause for the termination of his employment."  Id.

Arbitrator Kasher ordered Kinder Morgan to reinstate Hires "with seniority unimpaired and with full back pay and benefits as of March 27, 2012."  Id. at 23.

II.     Standard of Review

We have "very little authority to upset arbitrators' awards."  United Transp. Union Local 1589 v. Suburban Transit Corp., 51 F.3d 376, 379 (3d Cir. 1995).  We are to "enforce an arbitration award if it was based on an arguable interpretation and/or application of the collective bargaining agreement," and we may vacate the award only "if there is no support in the record for its determination or if it reflects a manifest disregard of the agreement, totally unsupported by principles of contract construction."  Exxon Shipping Co. v. Exxon Seamen's Union, 993 F.2d 357, 360 (3d Cir. 1993) (internal quotations omitted) (hereinafter "Exxon I").[3] That is, "[a]s long as the arbitrator has arguably construed or applied the contract, the award must be enforced, regardless of the fact that a court is convinced that [the] arbitrator has committed a serious error", United Transp., 51 F.3d at 379 (quoting News America Publications, Inc. v. Newark Typographical Union, Local 103, 918 F.2d 21 (3d Cir. 1990)) (emphasis and second alteration in original).

In determining whether the arbitrator has "construed or applied the contract," we look to see whether the arbitrator's decision "draws its essence" from the CBA.  Id.  "An arbitration award draws its essence from the bargaining agreement if 'the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context, and any other indicia of the parties' intention'", id. at 379-80 (emphasis in original).

We defer so broadly to arbitrators' decisions out of respect for the "preference for arbitration expressed in federal labor laws" and the "desire to promote the benefits of labor

_____

[3] Our Court of Appeals heard three disputes between Exxon Shipping Company and the Exxon Seamen's Union between 1993 and 1996.  In the third dispute, the Court began referring to the cases as Exxon I, Exxon II, and Exxon III, a formula we employ here, though we do not refer to Exxon II in this Opinion.

arbitration -- speed, flexibility, informality, and finality", Exxon I at 360 (citing Penntech Papers, Inc. v. Union Paperworkers Int'l Union, 896 F.2d 51, 53 (3d Cir. 1990)).

As a reviewing court, we "must defer to the arbitrator's factual findings", Citgo Asphalt Refining Co. v. Paper, Allied-Industrial, Chemical, and Energy Workers Internat'l Union Local No. 2-991, 385 F.3d 809, 816 (3d Cir. 2004).  We must credit an arbitrator's fact-finding and contract interpretation "'as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority,' rather than simply applying his own brand of industrial justice." U.S. Postal Service v. National Ass'n of Letter Carriers, 839 F.2d 146, 149 (3d Cir. 1988) (quoting Misco, 484 U.S. at 38).

Nor do we review an award for legal error.  See Citgo, 385 F.3d at 815; Exxon Shipping Co. v. Exxon Seamen's Union, 73 F.3d 1287, 1295 (3d Cir. 1996) (hereinafter "Exxon III").  As long as the award "draw[s] its essence from the collective bargaining agreement", we may not vacate it even if we "disagree[] with its conclusions under the law." Citgo, 385 F.3d at 816 (quoting Stroehmann Bakeries, Inc. v. Local 775, Int'l Brotherhood of Teamsters, 969 F.2d 1436, 1444 (3d Cir. 1992)).  An award draws it essence from the CBA if

> the interpretation can in any rational way be derived from the agreement, viewed in the light of its language, its context and any other indicia of the parties' intention; only where there is a manifest disregard of the agreement, totally unsupported by principles of contract construction and the law of the shop, may a reviewing court disturb the award.

Exxon III at 1295 (quoting Super Tire Engineering Co. v. Teamsters Local Union No. 676, 721 F.2d 121, 124 (3d Cir. 1983) (further internal quotations omitted).  Thus, we review only for "minimal rationality." Exxon III at 1297.

Of course, we bear in mind the long-standing principle that "a court may not enforce a collective bargaining agreement that is contrary to public policy", W.R. Grace and Co. v. Local Union 759, 461 U.S. 757, 766 (1983), and so we may not "enforce an arbitrator's award" made under such an agreement. United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 42 (1987). "[T]he question of public policy is ultimately one for resolution by the courts." W.R. Grace, 461 U.S. at 766.

Our Court of Appeals has found that an arbitration award may violate public policy even if it does not "contravene[] a [stated] rule of positive law", because "the contours of positive law are broad enough to include not just specific rules or prohibitions but also the stated purposes behind these rules or prohibitions." Exxon I at 363-64. Thus, an arbitration award violates public policy if it contravenes either a specific law or the stated purpose of that law, but in either case "the public policy 'must be well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest'", United Transp., 51 F.3d at 381 (quoting W.R. Grace & Co. v. Local Union 759, 461 U.S. 757, 766 (1983)) (further internal quotations omitted).

The public policy exception is narrow. Id. at 382 (quoting Service Employees Int'l Union Local 36 v. City Cleaning Company, Inc., 982 F.2d 89, 92 (3d Cir. 1992) for the proposition that "'the public policy exception' to the enforcement of arbitration awards 'is slim indeed.'") (internal alterations omitted)). As the Supreme Court has emphasized, there is no "broad judicial power to set aside arbitration awards as against public policy." United Paperworks Int'l, 484 U.S. at 43.

Vacating an arbitration award because it conflicts with public policy requires a two-step process. First, we must determine "whether a well defined and dominant public policy

can be identified." Exxon III at 1291.  If we can identify such a policy, we then must "determine whether the arbitrator's award, as reflected in his or her interpretation of the agreement, violated the public policy." Id. at 1291-92.  We are to vacate an award if enforcing it would "thwart the purpose" of either the statute's terms or its stated purpose.  See Exxon I at 364.

III.     Discussion

        A.     The Award Was Not Contrary To Public Policy

                1.     There Exists A Public Policy Balancing the Need
                             For Workplace Safety With The Prohibition On Discrimination

Kinder Morgan argues that under the Exxon III two-step regime, we must find that the award is contrary to the public policy of "workplace safety".  See Pl. MSJ at 11.  In support, Kinder Morgan cites G.B. Goldman Paper Co. v. United Paperworkers Int'l Union, Local 286, 957 F. Supp. 607, 618 (E.D. Pa. 1997), in which Judge Brody explained that "there is a 'well defined and dominant' public policy of workplace safety . . . ." Id. at 620.  Kinder Morgan also relies on federal statutes that reflect a concern for safety in the workplace.  The Occupational Safety and Health Act of 1970 ("OSHA"), for example, "requires all employers to furnish a workplace 'free from recognized hazards that are causing or are likely to cause death or serious physical harm to [their] employees'", Pl. MSJ at 11 (quoting 29 U.S.C. § 654(a)), and the ADA "requires plaintiff-employees to demonstrate as part of their prima facie case that they can safely perform the essential functions of their position", id. at 12 (citing 42 U.S.C. § 12113(a)-(b)).  Kinder Morgan also cites the ADA's direct threat defense.  Id. (citing 42 C.F.R § 1630.2(r)).

The Union does not dispute that workplace safety is such a public policy -- it is willing to "assum[e] workplace safety is a well-defined and dominant public policy", Def. Resp.

at 5, but it argues that Congress has defined the contours of the workplace safety policy with an eye toward "protecting disabled workers, and those who are perceived as disabled, from discrimination", id.  The Union contends that "Congress has specifically legislated regarding the interaction between the public policy concerns of enhancing workplace safety and protecting individuals from discrimination based on perceived disability", id. at 6, by creating the "direct threat defense" whereby an employer may "discriminate on the basis of disability when the employee poses a 'significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation.'" Id. (citing 29 C.F.R. § 1630.2(r) (emphasis in Def. Resp.)).  The Union points out that the arbitrator "specifically cited to the direct threat defense in his opinion",[4] and argues that Kinder Morgan is "trying to have this Court re-litigate the merits of the case", and "using the public policy exception to institute a lower bar to termination of an individual with a perceived disability than Congress has already set."  Id.

        The federal statutes Kinder Morgan cites do evince a concern for safety in the workplace.  According to 29 U.S.C. § 651, the "Congressional statement of findings and declaration of purpose and policy" for OSHA, the law was motivated by the finding that "personal injuries and illnesses arising out of work situations impose a substantial burden upon, and are a hindrance to, interstate commerce in terms of lost production, wage loss, medical expenses, and disability compensation payments", § 651(a).  Moreover, in the same section, "The Congress declares it to be its purpose and policy, through the exercise of its powers . . . to

----

[4] As we discuss below, the issue before the arbitrator was not whether Kinder Morgan had successfully established a direct threat affirmative defense under the ADA, but whether the company had shown just cause to terminate Hires.  The arbitrator looked to the ADA's direct threat defense not to establish the standard in the matter before him, but for guidance on the Congressional policy regarding the intersection of workplace safety and disability discrimination.

assure so far as possible every working man and woman in the Nation safe and healthful working conditions . . . ."  § 651(b).

As Judge Brody explained in G.B. Goldman Paper Co., our Court of Appeals has also suggested that a policy of ensuring workplace safety exists.  See, e.g., United States Postal Serv. v. National Ass'n of Letter Carriers, 839 F.2d 146, 149 (3d Cir. 1988) (assuming, arguendo, that "there is a public policy against permitting an employee to direct physical violence against a superior"); Super Tire Eng'g Co. v. Teamsters Local Union No. 676, 721 F.2d 121, 125 n.6 (3d Cir. 1983) (finding that reinstating an employee who had been fired for drinking on the job would not violate public policy in part because "[t]here was no evidence that [he] pose[d] a threat to fellow workers or society", and thus suggesting that had he posed such a threat, his reinstatement would have violated a public policy of workplace safety).  Moreover, the Union does not dispute that such a public policy exists here.  We thus agree with Judge Brody that there is a "well defined and dominant" public policy favoring workplace safety.  But we also agree with the Union that Congress has incorporated the policy of non-discrimination in defining workplace safety, and in doing so has struck a balance of public interests.  The ADA regulations containing the direct threat defense embody this balance.

2.    The Award Does Not Violate Public Policy

Kinder Morgan argues first that the award violated the public policy of workplace safety because the arbitrator was faced with an "undivided medical opinion that Mr. Hires [could not] work safely due to his spinal condition", and in light of that opinion, "reinstating Mr. Hires to his longshoreman position would violate the public policy against allowing such known serious safety risks in the workplace."  Def. MSJ at 14.

Kinder Morgan next reasons that "the arbitrator made no finding that Mr. Hires could safely return to work", id. at 17 (emphasis in original), and so, under the Company's reading of Stroehmann, 969 F.2d at 1444, the award violated public policy because it "would have reinstated (the employee) without determining the merits of the allegations against him."

The Union responds that Kinder Morgan misstates the evidence the arbitrator considered. Rather than facing "undivided medical opinion" of incapacity, the arbitrator considered "the medical reports submitted by the Company, as well as the testimony offered by the Company's witnesses", Def. Resp. at 3, and he made the factual finding that there was insufficient medical evidence to support the conclusion that Hires could not work. Id. at 7. Because we cannot revisit an arbitrator's factual findings, see, e.g., Exxon III at 1297 ("the public policy exception does not lessen our deference to an arbitrator's factual findings"), and because "employing an individual who is medically cleared to perform his job functions is" clearly not "a violation of public policy", the Union reasons, the decision does not violate public policy. Def. Resp. at 9.

We agree. Arbitrator Kasher considered Dr. Cohen's and Dr. Lee's reports and he found that there was insufficient medical evidence to support the conclusion that there was a "significant risk of substantial harm to the Grievant and/or his coworkers if he were to work at the Fairless Hills Terminal", and thus that there was no just cause to terminate Hires. Decision at 22. We are bound by these factual findings.

As we explained, the public policy regarding workplace safety embodied in OSHA and the ADA establishes a balance between the priorities of workplace safety and non-discrimination for employees who have, or are perceived to have, disabilities. Enforcing Arbitrator Kasher's award would not "thwart the purpose" of these laws, see Exxon II at 1293.

Stroehmann, on which Kinder Morgan relies, is not to the contrary.  In that case an employee was fired for "immoral conduct" after a customer complained that he had sexually harassed her.  The union grieved the termination and then brought the dispute to arbitration, where the arbitrator found that the employer had not given the employee "a full opportunity to refute the charge or explain his conduct and so reinstated him without deciding whether the charge of sexual harassment was true."  Stroehmann, 969 F.2d at 1438.  The district court vacated the award as violating public policy, and the Third Circuit affirmed, finding that, "[u]nder the circumstances present here, an arbitrator's award reinstating an employee accused of sexual harassment without a determination regarding the merits of the allegation violates well-established and dominant public policies concerning sexual harassment in the workplace."  Id.

We read Stroehmann in light of our Court of Appeals's repeated warnings, canvassed above, that the public policy exception is "slim indeed."  As our Court of Appeals explained in United Transp. Union Local 1589, 51 F.3d at 382, in order to trigger the exception a party must show that the "award create[s] an explicit conflict with an explicit public policy".  In that case, the Court reversed a district court's decision vacating an arbitration award.  The employer had fired a driver after he rear-ended a tractor trailer, the third preventable rear-end collision he caused in his twelve years with the company.  The arbitrator found that though the grievant was responsible for the accident, "discharge was too harsh a sanction for a long term employee where the employee had been afforded no opportunity to improve his driving skills . . . ."  Id. at 379.  The district court vacated the award, and, when the union appealed, the employer argued that the appellate court should affirm on the ground that "public policy demands that common carriers provide safe carriage to their passengers, and that the arbitration award undermines this policy."  Id. at 381.  Our Court of Appeals declined this invitation, finding that

the employer "failed to demonstrate that public policy requires vacation of the arbitrator's award here" because the company "simply ha[d] not shown that the arbitrator's award in this case would explicitly conflict with the public policy" of common carrier safety.  Id. at 382.  The Court distinguished Stroehmann on the ground that there "the public policy was much more explicit and the conflict between it and the particular award much more pronounced than is the case here."  Id. at 382 n.2.

Like the decision in United Transp. Union Local 1589, the arbitrator's decision here does not create an explicit conflict with an explicit public policy.  The arbitrator found that there was insufficient medical evidence to show that Hires's medical condition created a "significant risk of substantial harm to the Grievant and/or his coworkers if he were to work at the Fairless Hills Terminal", and so he found that there was no just cause for his termination.  Enforcing this decision does not create an explicit conflict with a public policy favoring workplace safety.

B.       The Award "Draws Its Essence" From The Collective Bargaining Agreement

Kinder Morgan argues the award does not "draw its essence" from the CBA for two reasons.  First, Kinder Morgan contends that the arbitrator prevented the company from firing an employee who did not perform any work for twelve months, in contravention of the CBA's terms.  Kinder Morgan notes that the CBA "specifically provides that 'seniority and employment shall be lost' when an employee fails to perform any work for twelve months", and Hires "failed to perform any work for twelve months."  Pl. Mot. at 21 (quoting Stip. Facts ¶¶ 16, 32).  According to Kinder Morgan, "[n]o rational reading of the collective bargaining agreement

16

could lead to the conclusion that an employee's attempted return to work, when he is medically incapable of working, somehow meets the requirement of performing work." Id.

The Union responds that "it was the Company itself that refused to permit Mr. Hires to return to work within the twelve-month period due to its own conclusion regarding his medical ability to perform his job duties", and

> if the Company had unilateral power to deny its bargaining unit employees access to work for a twelve month period based on its own, unchallenged opinions regarding medical fitness to return to work, the entire grievance process would be rendered useless, as the Company would have an unfettered right to "run out the clock" and terminate employees at will.

Def. Resp. at 11-12.  The Union concludes that "[t]he Arbitrator properly disregarded this argument." Id. at 12.

Section 25.25 of the CBA contains the conditions under which Kinder Morgan can terminate employment.  The CBA therefore contemplates a "for cause" firing system rather than a system of "at will" employment.  The Union is correct that the essence of the "for cause" system would be lost if Kinder Morgan could generate cause by refusing to allow an employee to work for twelve months and then firing him for failing to work during that period.  Arbitrator Kasher's rejection of the argument that Kinder Morgan had cause to fire Hires because he did not work for twelve months, when the Company rejected his attempt to return to work, readily meets the standard of having been "in any rational way … derived from the agreement", and we will not vacate the award on this ground.

We turn to Kinder Morgan's second argument, that "the arbitrator impermissibly rewrote" the contract by requiring Kinder Morgan to establish a direct threat defense before the arbitrator found that Hires had made a prima facie case of discrimination by showing that he was

17

a qualified individual with a disability.  Pl. MSJ at 22-23.  In doing so, Kinder Morgan argues,

the arbitrator "put the cart before the horse" and "rewrote the ADA and thus the contract's

terms."  Id. at 22.

Kinder Morgan argues that even if it did bear the burden of showing a significant

threat, it met that burden.  The Company notes that under the ADA, the assessment of a

"significant risk of substantial harm" "does not require any specific quantum of evidence", id. at

24, and instead must only "be based on a reasonable medical judgment", 29 C.F.R. § 1630.2(r).

Kinder Morgan essentially contends that the arbitrator improperly interpreted the

burden-shifting framework of the ADA, and because the ADA was incorporated into the CBA

through Article 13, his award did not "draw its essence" from the contract.

Article 13 contains the following provisions:

**Section 13.1  No Discrimination.**  The Company and the Union
agree there shall be no discrimination or harassment against any
employee because of his/her race, color, religion, sex, national
origin, age, disability, or military or veteran status.

. . .

**Section 13.2  Interpretation.**  This Article shall be interpreted in
accordance with applicable federal and state law.

**Section 13.3.  Reasonable Accommodation.**  In the
administration of this Contract, the Company and Union shall
provide reasonable accommodation to qualified individuals with a
disability . . . The Union shall fully cooperate in the reasonable
accommodations provided by the Company.  The Company shall
determine the need for an extent of such accommodation in
accordance with the requirements and interpretations of the
Americans With Disabilities Act and Title VII of the Civil Rights
Act of 1964.

**Section 13.4  Remedy At Arbitration.**  An arbitrator hearing a
grievance that alleges a violation of this Article is authorized to
award only reinstatement and/or back pay and benefits to a
prevailing grievant and has no authority to award compensatory,

> punitive or monetary damages other than back pay.  The arbitrator
> may also determine the reasonableness of an accommodation
> provided by the Company or whether an accommodation was
> necessary.

CBA Art. 13.

The company's objection to the arbitrator's direct threat defense analysis misconceives the nature of the arbitrator's task . Arbitrator Kasher was called upon to render a decision in a labor dispute based on a grievance Hires raised under the CBA.  He was not evaluating an ADA suit filed on Hires's behalf.

In the "Third Step Grievance Response", Price wrote on behalf of Kinder Morgan that "[t]he company can find no violation of the current collective bargaining agreement", because according to the Company, "[f]ollowing Mr. Hires [sic] examination by Dr. Bong Lee, his termination effective September 9, 2011 is appropriate", and so Kinder Morgan denied the grievance.  May 7, 2012 Kinder Morgan Third Step Grievance Response, Decision Ex. J4.

The arbitrator thus framed the question before him as "whether the Employer had just cause to discharge the Grievant", Decision at 16, and he found that the company was obliged to show just cause for the termination by "clear and convincing evidence", which he noted is "[t]he prevailing standard applied by most arbitrators."  Id.  As Arbitrator Kasher made clear at the outset of the hearing, "this is a termination matter and, as experienced Counsel knows, it's the employer's burden", Hearing at 6:19-21.  Neither party objected to this statement.

Arbitrator Kasher explained that "the Company is asking this Arbitrator to uphold the discharge of a 20 year journeyman, with an impeccable work record, based upon the opinions contained within the medical reports of two physicians", Decision at 18.  He thus considered Dr. Cohen's and Dr. Lee's reports over the Union's hearsay objection.  Id. at 17-19.  As we described

above, he found that "[t]hese reports do not provide this Arbitrator with guidance as to the

Grievant's present ability to safely perform the <u>essential functions</u> of his job, nor do these reports

provide any indication as to what work the Grievant could perform."  <u>Id.</u> at 22 (emphasis in

original).  He therefore concluded that "the decision to discharge the Grievant was not based on

sufficient medical evidence and therefore there was not just cause for the termination of his

employment."  <u>Id.</u>

Article 13 of the CBA twice incorporates the ADA -- once implicitly by saying

that the CBA's non-discrimination provision "shall be interpreted in accordance with applicable

federal and state law", and once explicitly by providing that the company must determine "the

need for an extent of [a reasonable] accommodation in accordance with the requirements and

interpretations of the Americans With Disabilities Act . . . ."  But the nature of the dispute the

arbitrator resolved was not a suit under the ADA.  Instead, it was a labor dispute that the Union

had pursued through the CBA's grievance process.

Thus, though the arbitrator did refer to the ADA's "direct threat" affirmative

defense, as the Union persuasively argues he looked to it "as guiding authority in assessing the

Company's position that Hires was a threat to himself or others."  Def. MSJ at 14.  The ultimate

question before him was whether there was "just cause" for the termination -- not, as it would

have been had Hires brought suit under the ADA, whether the company had impermissibly

discriminated against him.  Because of the nature of the question before the arbitrator we cannot

say that referring to an affirmative defense under the ADA without requiring Hires to make a

<u>prima</u> <u>facie</u> showing of capacity was in "manifest disregard of the agreement", such that the

award does not "draw its essence" from the contract.

We will thus deny Kinder Morgan's motion for summary judgment and grant the Union's motion for summary judgment as to the arbitral award.

C.      Remedies

The Union asks us to enforce the award and order Kinder Morgan to reinstate Hires with unimpaired seniority and full backpay and benefits as of March 27, 2012, see Def. MSJ at 15; Counterclaim ¶ 5(a), grant Hires prejudgment interest, and award the Union attorney's fees and costs.

The Union seeks attorney's fees and costs "[b]ecause of the Company's intransigence and the frivolity of its lawsuit . . . ." Def. MSJ at 16-17.  Though Kinder Morgan did not prevail, we find its position was not frivolous.  As our Court of Appeals explained in Mobil Oil Corp. v. Independent Oil Workers Union, 679 F.2d 299 (3d Cir. 1982), "[u]nder the American rule, each party normally must bear the burden of its own legal expenses, including attorneys' fees", id. at 305, but an exception arises if "the losing party litigated in bad faith, vexatiously, or for oppressive reasons." Id.  The Court found that the district court did not abuse its discretion in finding that although Mobil lost, its position was not "so lacking in merit that costs and attorney's fees should be (imposed) against it." Id.  (alteration in original).  Our Court of Appeals relied on three considerations there that are instructive -- first, the employer there brought the appeal of the arbitral decision promptly, as Kinder Morgan did here.[5]  Second, there was no indication there that the employer "ha[d] a history of refusing to comply with arbitration awards", id., nor has the Union shown that Kinder Morgan has a history of non-compliance here. Finally, as the employer did in Mobil, Kinder Morgan presented a substantial legal issue here. We will therefore deny the request for attorney's fees and costs.

---

[5] Arbitrator Kasher rendered his decision on June 29, 2013, and Kinder Morgan initiated this action exactly a month later.

We turn to the question of prejudgment interest.  We have discretion to award prejudgment interest in claims arising under federal labor law.  See, e.g., Glass, Molders Int'l Union v. Owens-Illinois, Inc., 758 F. Supp. 962 (D.N.J. 1991) (citing Ambromovage v. United Mine Workers, 726 F.2d 972, 982 (3d Cir. 1984)).  Our Court of Appeals has guided our use of this discretion by counseling that prejudgment interest should be "given in response to considerations of fairness" and "denied when its exaction would be inequitable." Ambromovage, 726 F.2d at 982 (citing Board of Commissioners of Jackson County v. United States, 308 U.S. 343, 352 (1939)).  Prejudgment interest is usually available when the damages "are ascertainable with mathematical precision", Eazor Express, Inc. v. Int'l Brotherhood of Teamsters, 520 F.2d 951, 973 (3d Cir. 1975) (see also, e.g., Local Union No. 825 v. Key Contracting, LLC, No. 05-3269, 2006 WL 1540997, at *6 (D.N.J. May 30, 2006)).

Here, the prejudgment interest is ascertainable with mathematical precision -- it amounts to the backpay Kinder Morgan owes Hires from March 27, 2012 until today.  Moreover, because we have found that we cannot vacate the arbitrator's decision, granting prejudgment interest will put Hires in the position he would have been in had Kinder Morgan not appealed the arbitration award, and considerations of fairness therefore counsel in favor of granting prejudgment interest.

The parties have not submitted any briefing on calculating this amount, so we will retain jurisdiction of this matter to determine the amount of prejudgment interest Kinder Morgan must pay.

BY THE COURT:

/S/ STEWART DALZELL, J.

22